17-1696 Mr. Tarnoff, you've reserved five minutes for rebuttal. That's correct, sir. Okay, you may proceed. Good morning, Your Honors. May it please the Court, I represent Komatsu in this appeal. In this case, the Board failed to establish a prima facie case of obviousness with respect to the claims on appeal in that the Board did not sufficiently explain and support its conclusions with substantial evidence that one of ordinary skill in the art might have chosen to combine the references. Here, the Board found that the claimed inventions might be obvious. Not that they would be obvious, but that they might be obvious. Here, the Board has failed to provide any evidence that the references can be combined as they suggested. In this appeal, the Board has combined basically two references. However, the examiner had combined four references for the basic rejection. The Board decided that the other two secondary references were unnecessary for this appeal in that they added nothing to the primary references. The basic argument is that the Board found that the threaded connection of the Couch 126 patent for the electrode could be interchanged with a resilient or an elastic fit. And that there would be some motivation to do it because you'd have basically some reasonably expected benefits in replacement. Well, the Board specifically said that it was to secure faster, easier, independent replacement of the electrode. Well, we take issue with that in that first, the Reed patent, which is the secondary reference relied upon to show the elastic fit. It is not directed to an electrode. It is directed to an insulator that's attached to a nozzle base. The insulator's made of ceramic. The nozzle base is made of copper. There's no electricity passing through those points, so it's not an electrical connection. They have no evidence whatsoever on this record to show that this elastic fit can be used with an electrode where you have current passing through at a very, very high amperage. The primary reference says that at the end of this torch tip, we have 60,000 amps per square inch. What we're doing is we're cutting metal. We're blowing out molten metal. And so the problem is, is when you look at this secondary reference of Reed, there's no teaching of how you're going to apply this. The Board never explains how this is going to happen. And in fact, they ignore the issues that we raise. Namely, one, you have an alignment issue. As noted in the Reed patent, the secondary patent, the Reed patent noted that, well, you need to make sure that alignment's good in the nozzle so that the arc can pass through. When you say they ignore these issues, what do you mean? Well, they didn't address them at all. They just said... Is that really true? I mean, I'm looking at the Board's decision at pages 42 and 43, and it's specifically addressing the patent owner's argument that the fit taught by Reed is inferior because it may not align. And then it goes on to talk about the difficulty of the electrical connection. I mean, it specifically addresses those arguments. It seems to me... Well, it mentions them, but it just... Well, you just said they didn't address them at all. Well, they didn't... You shouldn't overstate the record. I'm sorry. I mean, it is very conclusory here. Yes. I think you may have some arguments that suggest that the Board completely ignored them is not helping your case. Okay. Yes, they... Can you explain to me why that analysis in 42 and 43 isn't sufficient under a substantial evidence standard? Sure. So, in that analysis, they really don't say, well, how are you going to overcome the resistance problem? How are you going to overcome the alignment problem? As we pointed out in the Reed patent, we have a ceramic insulator. There's no electrical connection. And therefore, you don't have the problem of electricity passing through here. And again, we're talking about a plasma torch, something that's meant to cut through metal. So, the electricity that's passing from the cathode to the electrode at that point has to be very secure. Well, let me give you my take on what these paragraphs say. It doesn't seem to be all that clear, but it seems to suggest we recognize that Reed has problems. But given the motivation to get the ease of this different connection, people would make that tradeoff. Yes. Well, the ease... Isn't that good enough? Isn't that a good enough reason that... Because I think they also suggest that nobody's shown this wouldn't work, that it might be not as good as the threaded connection, but that's a tradeoff they want to make with replacement being easier. Yes, but the motivation is found in the Reed patent. But the Reed patent is directed to a ceramic insulator that's on the base nozzle. And the solution that Reed talks about is they said, in the prior art, we want to make sure that the alignment of the nozzle and the insulator, the ceramic insulator, are properly aligned. So, in the past, they glued them on together. So, the solution that Reed was directed to is this problem of alignment and the replacement... I don't understand why you're making that argument. I mean, the only reason to get to Reed is for the specific type of connector, right? The rest of the stuff is all in the other reference. Yes, but the motivation to use this... Well, first of all, the electrode is removable. The motivation to use the different connector is it's easier to get in and out. Well, I mean, in the Couch 126 patent, you still have to undo the retainer cap. You have to take off all the nozzle. That's why you use the other one in Reed because Reed makes clear it's easier to get in and out, right? It's only easier if you used it as the board suggested. It's only replacing the threaded connection of the electrode with the elastic fit of Reed. But it's not that much easier to get out except for not having to unthread. You still have to remove all of these pieces in the Couch 126 patent to get to the electrode. But what the Reed is really talking about is they're really talking about the insulator and having that. Their solution and the problem they had was directed to the fact that these two pieces were usually permanently attached together. It has nothing to do with the easability of an electrode being removed. I mean, basically, the electrode, what they're saying is instead of having to unscrew it, we can now slide it out. But what I'm saying is that the scientific principles that one's field in the art would be burdened with is the knowledge that if I take away those threads, now I'm just going to have an elastic fit. And that's similar to like if you had a car. You have a car and you have a lug nut. The lug nut has screws on and you can take that off, but you're not going to replace that with an elastic fit because of the brave problems that you're going to have if that wheel comes off. Well, we have very... But that's the problem here. The board didn't find that there would be three problems which would go against the motivation combined. It says that you may know... And again, I don't find their reasoning to be as solid as it could be. But it says it makes no representation as to the degree of which this fit would be inferior. So it's not like changing from a lug nut to a push-in thing on a car where the whole thing might collapse. We don't know that. In fact, it recognizes it might be inferior, but it's worth the trade-off. Well, the problem is we don't know what the hypothetical device would be. There's no way of really testing this. So we have to rely on what one skilled in the art would know. And those are the scientific principles that have not been disputed by the appellee in that when you have this... But again, that's the problem. I mean, they make the conclusion that one skilled in the art would have chosen to replace the threaded thing in couch with the resilient fit in reed. And the reason to do it was to make an easier implementation, a replacement. But again, reed is directed to easy implementation of independently replacing the nozzle base with respect to the insulator. Sure, but it doesn't have to teach it precisely. I mean, it can be directed to something else. I think our precedent makes that clear. Yes. I mean, they're just going to reed for the elastic. Is that the resilient fit? The resilient fit. Yeah, reed shows the resilient fit. They show a resilient fit for a non-electrical situation. And my point is that when one skilled in the art is going to be looking at that, what they're going to be worried about is these other issues. And that the board didn't really address these other issues. That's your problem, I think. I mean, I think you have a pretty good argument that the board didn't pay enough attention to it. But they certainly addressed them. And they said a person skilled in the art would understand how to do this. OK. Isn't that good enough? Assume they have evidence to support that conclusion. If they have evidence, but there's no evidence that there is any interchangeability. That's my problem. All right, you're into your rebuttal time. OK, thank you. Mr. Rubio. Could you start with that last point and tell me what evidence in the record support? I mean, you know the pages I'm talking about in the board's decision, page 42 and 43. I do. It is incredibly conclusory. What evidence actually supports those conclusions? I believe the board did a good job of specifically listing what skills a person skilled in the art would need to have. But what did they cite to support that conclusion? Oh, OK. Well, they reference back to the… Can you just turn to pages 42 and 43 of the board's decision and walk me through how any of that is more than just conclusory statements? OK. I'm down at the bottom. Page 42? Yeah. OK. I don't have the exact sites as it pertains to there, but when they're talking about the… As the appellant discussed, the board uses the MITE combined language. The board there is referring back to the appellant's appeal before the patent board, where they themselves introduced the main cause. I'm not so concerned about the MITE combined language. I don't think would combine versus might combine makes any difference to me. What I'm concerned about is the fact that nobody has shown that the prior art teaches you would use this type of resilient fit to make an electrical connection. Is that true? I mean, is there any cited piece of prior art that uses a resilient fit to make an electrical connection? As cited in the record, no. Right. And that's at least an important distinction between Reed and this invention. And the only thing we have to suggest that you could use Reed to make an electrical connection is, as far as I can tell, just a conclusion by the board without citing any evidence. Are you saying that—again, maybe you can explain to me. At the bottom, page 42, they cite a bunch of—they cite some parts of Reed. To support that, does any of that suggest a motivation to use Reed to make an electrical combination? Or all we're relying on really is the next sentence. A couple sentences later, at the top of page 43, that is just a conclusory sentence without any support whatsoever. That one of ordinary skill might have chosen to replace the threaded connection in Cal with the resilient fit in Reed to do all this stuff. Look, I get it. There's the motivation to combine by making a tradeoff between ease of fit and possible less good electrical combination makes sense to me. But there's not an expert report. There's no kind of statement. And there's no citation in any of the evidence that that is actually true, that somebody would make that fit. It is the board's conclusion. How is that good enough? Well, the board breaks down this combination to the base mechanical elements and then the electrical elements. In their argument, they say that a person skilled in the art would recognize that this is the problem of taking a cylindrical consumable and mechanically attaching it inside a cylindrical board. In the 126 invention, the threaded connection was used. And in the Reed invention, the resilient elastic members were used. I'm with you. But where is – this invention is not just about changing two different mechanical fits. The electrical connection is critical to this. Correct. Right? So where is substantial evidence that they would have opted to swap in Reed to make the electrical connection as well? I believe what the board is arguing, and this goes back all the way to the actual closing prosecution dated December 23rd, 2013, Appendix 689, where they say that – where they address specifically the issues of misalignment and resistance and actually bring up the issue of skill in the art, where they say this would amount to exercising normal skill in the art, which has concerns that plasma torches would appear to be quite high when considering the complexities involved. What are you reading from? This is Appendix 689. I don't think I have a 689 in my appendix. Is that possible? It may not be decided completely. Well, that's not very helpful if we can't see what it's all about. Is that in the board decision? It must be in an examiner point. Yes, it's an examiner point. But the board didn't adopt all the examiner's reasoning. This one refers to the account for that issue. It's identical arguments of misalignment and resistance that were brought up way back in 2013. The way I'm trying to argue is that the examiner said this amounts to standard skill in the art. And where that comes into play, if you look at the 126 disclosure, it just shows you a rudimentary figure. But they didn't even cite the examiner's statement in their opinion. I don't recall where they said that. But I believe the Novaris case I cited in the response is that just because they don't expressly discuss every positive and negative aspect doesn't mean they didn't consider it and come to their decision. In this case, they had the full record. They had several years' worth of the same arguments to consider when they rendered their opinion. Do you know, the board only, and I don't think we can do this or we could get here right now, but the board only relied on Couch and Read. Did the examiner rely, these other two references that were out there, do they show anything about using this resilient fit as an electrical connection? The board clarifies as to this in Note 3 of their decision where they say their decision doesn't rely on copper, that being obvious, use copper for an electrode, and that copper is inherently resilient. Sober is the reference that says that it would be obvious to use copper for an electrode, and it is Lou that says copper is inherently resilient. So both of those two findings, the board found, were already included in the Couch 126 disclosure because a person skilled in the art would arguably know to use copper because the design specifications for an electrode limited to a material that's highly conductive in both thermally and electrically. Are you saying then that because Couch teaches using a certain type of metal that one would know that even under a resilient fit rather than a threaded fit that that would conduct electricity in a proper way? Correct. If the electrodes are made out of one piece, as we've seen in virtually all the disclosures, they would not make it out of two pieces. So if they made the entire electrode out of copper, including the resilient members... Where did the board say that? This goes back to the argument where they say they would adjust the size of the resilient fingers and the mating components such that it would have the appropriate amount of resistance, which was never actually named. The other argument in working with that, when they're adjusting the other components of the assembly, the electrode also has a flange. The flange is what makes perpendicular to the torch body, and that would also be a source of conduction as well. Not all the electrical conduction is limited to the threads or resilient members. If you look at the figure five of Couch, you see that you have the electrode, then you have the swirler that sits on top of the flange of the electrode, which is where the electrode sits on the torch body. Then you have the nozzle that sits on top of the swirler. There's a shield on top of the nozzle, and then an outer retaining cap that presses down the entire assembly. So the flange, regardless of whether you use a threaded fit or the resilient fit, is pressed in between the entire assembly and the mating flange of the torch body. And that's the type of adjustment that a person of the scale of the art would make. I believe the appellant brought up an issue where they argue that the board changed their basis for rejection, and I think that goes back to what you mentioned, they no longer rely on the inherent, it being obvious to make the electrode out of copper, or copper being inherently resistant, or resilient rather. In their decision, they sustained the decision of the board and expressly stated that all pieces of prior art cited by the examiner were included in their decision. Because they said the decision didn't rely on the inherency or being obvious to make the electrode out of copper, it doesn't change their decision. They just said they need to argue it, because in their opinion, it was already included in Couch 126. Is that it? I don't see any further questions. Okay, thank you. You have three and a half minutes. Thank you. Can I just follow up on what he said? I may be mischaracterizing his argument, but this is how I understand it, which is Couch teaches to make these electrodes out of copper, and that copper would have the right conductivity by its very nature. And so when the board is saying, using the resilient tip versus the threaded tip, it's taking into account that the very structure of that electrode is still going to have the right conductivity because of the metal taught by Couch, and then all you're getting from Reed is the different tip, which doesn't really affect conductivity in any substantial way. If that's his argument, what's wrong with that? Well, Couch did not say it was made of copper. Rather, the examiner relied upon these other secondary references that said it was copper. Right. That's not really what I'm trying to get at, though. But we can see that the electrodes are made of copper. But even though copper would have the right conductivity to conduct it and everything, that's not really what we're saying the problem is. We're saying, okay, we have these threaded connections with the Couch reference, which provides the sufficient amount of surface area so you don't have buildup resistance. When you build up resistance, it's going to get hot. When you're talking about 60,000 amps per inch squared, every time you remove a piece of metal, that's going to increase your resistance by 1 ohm. And if you increase it by 1 ohm, 1 ohm difference of resistance is going to result in that kind of torch. 36 megawatts of difference. So we're talking about, if we're going to incorporate this, the conductivity of the copper doesn't matter. Yes, it's going to have the right conductivity, but the resistance at that connection is going to be increased when you start making these big cutouts. The board still hasn't, in your view, even accepting all this, explained why the change in tips, even if it did the same mechanical function, would be electrically sufficient. Yes, yes. And the appellee has mentioned various modifications that could be made, but the board didn't make those findings. If there was a statement from somebody that is a skilled artisan that even making this change between a threaded versus a resilient tip, the impact on resistance would not be so great that it wouldn't be offset by the ease of changing them, would that be sufficient? Because it seems to me that that's what the board says is the reason for the motivation to combine here. I think that's how I read that last sentence at the bottom of that paragraph on 43. But again, they don't cite to anything to support it. They don't cite to anything, and maybe you can read between the lines, is that what the reason is, but they didn't state that. And they didn't state that, and I would say that they can't get a statement that says that the resistance is not important in that electrical connection. I see that my time is up. We thank all the parties for their arguments this morning. This court now stands in recess.